v. General Electric Company We're ready, Mr. Shore, whenever you're ready. I'm sorry? We're ready whenever you are. May it please the Court, I'm here on behalf of the University of Florida Research Foundation to raise two arguments on appeal. The first argument is that the sovereign status of the state of Florida precludes a private party from coming in and basically destroying sovereign property rights for the benefit of a private party. Even when it's your client that's bringing the suit, right? Yes, Your Honor. And this is no different than the College Savings Bank context. Where in College Savings Bank, my client is free to infringe anyone else's patent at will and they can't be sued for infringing someone's patent. That's black letter law. It's established. You rely on New Mexico, University of New Mexico v. Knight. And you assert that a state that voluntarily asserts its rights as a plaintiff in federal court waives its Eleventh Amendment immunity but only as to compulsory counterclaims. Absolutely, in one-on-one challenge. I don't read Knight to limit waiver to only compulsory counterclaims. Well, then you also need to refer to Tejik v. University of Texas. Wait, wait, wait, wait, wait, wait, wait, wait, wait. We're talking about Knight. The majority expressly stated the issue before that court at that time was whether all versus at least with respect to certain compulsory counterclaims should be deemed waived. And the majority held the latter was true. Do you agree that Knight can't be limited in such a manner as you initially expressed in your briefing? Tell me why or why not. And stick to Knight. Well, we can't stick to Knight because Knight is an earlier case and after Knight came other cases that made it quite clear that only compulsory counterclaims are available to assert against the sovereign. Just like we don't stop at Marbury v. Madison, we can't just stop. No, we don't stop at Marbury v. Madison, so you're not relying on Knight anymore. Well, I am relying upon Knight that set the path. Path said only counterclaims, okay? Tejik, Hydro-Quebec, others have said only compulsory counterclaims. 101 is not a counterclaim at all, much less a compulsory counterclaim. So the first step you'd have to ask is, is 101 a counterclaim? It is not. And then even if you found it to be a counterclaim, which it's not, you'd have to ask, is it a compulsory counterclaim? Well, when you say it's not a counterclaim, I am assuming this is a variation of your argument that it's not an argument related to validity. Is that right? No, it's not. It's an argument related to eligibility, and eligibility and validity are not the same thing. But we have multiple cases in which we have held otherwise already. So how is it that you think this panel can, for example, reach a different result on this than, say, Dealer Track v. Huber, in which it said the conditions of patentability include Section 101? That was a panel of this Court that preceded us, and we're bound by it. So even if you could possibly prevail, can't you only prevail at our in-bank Court? Because isn't this panel, bound by prior decisions which have held that 101 is a validity defense? No. And the reason why is those do not involve sovereigns. There is no sovereign case. And the sovereigns stand in a very unique position. And believe me, I've been dealing with sovereigns for my entire legal career on both sides. And sovereigns stand in a very, very unique position as to other litigation. Your argument is predicated on the idea that Section 101 is not a defense under 282, that it is not an argument that the patent is invalid. Different questions. Those are different questions. What I'm saying is, absolutely, it's not a compulsory counterclaim. It's not a counterclaim at all, much less a compulsory counterclaim. And then you're saying, so they're not even entitled to have defenses because the only thing they can have are compulsory counterclaims. But then you're saying even if they were allowed to have defenses, they couldn't have it under 101, is that it? No. What I'm saying is, there are two buckets. There's a compulsory counterclaim bucket, which is a claim for affirmative relief or action. That's what a claim is. And it has to be compulsory based upon the exact same transaction or occurrence as the original claim. That's what a compulsory counterclaim is. This is not a compulsory counterclaim. And then you have the bucket of defenses. Defenses are not the same. Wait, wait. When you bring a suit, haven't you waived sovereign immunity as to defenses, as a legal proposition? Can't we start there? Defenses are allowed to be brought regardless of counterclaim. Pure defenses. Affirmative defenses. Pure affirmative defenses. Correct. This is not a pure affirmative defense because it is not simply saying I'm not liable. It's saying that your patent is invalid. Wait, wait, wait. Isn't it saying I'm not liable because your patent is invalid? Right, right. Well, no, it's actually I'm not liable because your patent should have never issued because it wasn't eligible for patentability. Right. And that is stepping in. What's the difference? It's a huge difference because that's stepping into a contract between the United States of America and the state of Florida. And that is saying on behalf of a private party. What if they said it was invalid because it was obtained by fraud? Same thing? Well, that case isn't before us, but you can't sue the state. You cannot sue the state of Florida for fraud unless the state of Florida waives their sovereign immunity. No one is suing the state of Florida for anything. I'm saying if this is an affirmative defense, why can't it be brought? Well, no one's ever held that 101 is an affirmative defense. That would be new. That would be brand new. You'd be the first court to ever do it. But even so, I would say it's not an affirmative defense by definition. Wait, wait, wait, wait, wait, wait, wait. Supposing the affirmative defense they asserted was plaintiff's complaint fails to state a claim upon which relief may be granted. That's not an affirmative defense, Your Honor. Well, yes, it is. It's the standard affirmative defense. Well, an affirmative defense requires proof, okay? Don't you agree that Section 282 of the Patent Code expressly articulates defenses that are available for someone accused of patent infringement? Yes, yes. Section 282 of the Patent Code affirmatively lists a number of defenses. Do you disagree with the characterization of those as affirmative defenses? I do not. Okay. Because they require clear and convincing evidence. In Dealer-Track v. Huber, what we've already held, Section 101 requires clear and convincing evidence. Yes. I know because I wrote an opinion that says that. Step two. Okay, so Section 2 of Dealer-Tracker says that I'm going to quote the defenses provided in the statute, comma, Section 282, comma, include not only the conditions of patentability in Section 102 and 103, but also those in Section 101, period. And that's a quotation from a prior case which we are bound by. Yes. And again— And I'm not suggesting we'd be the first case— No, no, no. —the first court ever to hold that Section 101 is an affirmative defense under Section 282. Dealer-Tracker, I just directly quoted you a holding that says expressly that, and I don't see how you think a panel of this Court, even if we disagreed with that holding, would have the authority to go against it. Well, first of all, I think that is a— Maybe it was loose language. It's a slight bit of a misnomer to call 101 an affirmative defense like 102, 103, 112. It's not the same. I assure you. I know the judge who wrote it. It was not loose language. Well, it's not the same. 101 is not the same as 102, 103, 112 because those have a patent— But now you're arguing why I should disregard the language. But as a panel, I don't get to do that. You do get to do that. Loose language. Wait. Am I supposed to say that was dicta? No. What you're supposed to say is this— So if it's not dicta, does an appellate court have the right to, as a panel, to disregard a prior panel decision that expressly decided that? I don't think you can disregard it, but you can certainly differentiate it. Here you have a private litigant going and trying to interfere with a private contract between the United States of America and the state of Florida and to vitiate— I don't understand. Do you think whether something is an affirmative defense or not differs depending on who they're sued? It's kind of like in your kitchen, do grits cook faster than every other kitchen? With sovereigns, that's absolutely true. What claims you can bring against a sovereign are completely different than what claims you can bring against a non-sovereign. When the sovereign's acting as a business entity, things change, don't they? No. In fact, that's what College Savings Bank said, that when you're acting as a—you're always a sovereign. Now, look, it's up to the state to waive sovereign immunity. They can do it. It's a political— You are familiar with the Sabatino Doctrine, aren't you? It's a political decision. We have 435— You are familiar with the Sabatino Doctrine, aren't you? Yes, I am familiar with the Sabatino Doctrine. But what we also have is we have 435 people down the street who have to run for election, and if they want to invoke the 14th Amendment, waive sovereign immunity, and undo the contract between the United States and the state of Florida, they can do that. They didn't do that in 282. They did not waive sovereign immunity. So you're telling me the 14th Amendment is still good law? The 14th Amendment is still good law. And not only is the 14th Amendment still good law, there supposedly are some wholly capable people down the street of invoking it where they can and waiving sovereign immunity as to both 282, as to 101, or anything else they want, but they haven't done it. I want to take you back. I miscited, and I apologize. I should have said page 26. I'll take you to page 32 in a minute. But at 26, you only cite Knight. You're telling me that I should have looked at other cases for that purpose, but you only cite Knight, a state that voluntarily asserts its rights as a plaintiff in federal court waives its 11th Amendment immunity, but only as to compulsory counterclaims. And I walked through my analysis of Knight, and you said, no, you should have looked at other cases. But you didn't cite it. I apologize. We should have. I mean, I argued the Tejik case to this Court, so I'm highly familiar with Tejik and what it holds. But Tejik holds the same thing. So does Hydro-Quebec. Let me take you to 32, where you discuss Alice. And you note in, quote, in his additional reflections upon this Court's decision in Alice, then-Chief Judge Rader noted, and you quote, of what precedential value are additional reflections? I mean, they might be, like, large. I have no idea. Reflections have whatever power the three of you want them to have. Whether or not you believe it. Well, we'll reflect on that. Yeah, you can reflect on that. But I mean, whether or not you believe those reflections are valid or not valid, that is certainly up to you to decide. I obviously agree. And I obviously think that to have a private litigant come in and destroy state property rights for the benefit of a private litigant is a classic violation of sovereign immunity. Congress is there to fix it if they want to fix it. State legislatures can fix it if they want to fix it. But that's the job of Congress or state legislatures. There is not a wit of discussion of waiving sovereign immunity in the Patent Act, in 282, in 101, or in any other part. They didn't talk about it. And you can't just imply that that's going to happen when it is never mentioned. A waiver has to be clear, unequivocal, open. It has to be absolutely stated. It's nowhere in the Patent Act. It's nowhere in the legislative history. It's nowhere in 101. It's nowhere in 282. You can't waive sovereignty because it's fair. Sovereign immunity is always unfair to the person who has it asserted against them. Believe me, I've represented babies with AIDS who got blood transfusions from state hospitals. And they got wiped out on sovereign immunity. This isn't about fairness. It's about the structure of a multi-sovereign, democratic nation where the dual sovereignty is absolutely enshrined in the Constitution. And if we're going to overcome dual sovereignty, it needs to be done by Congress or the states themselves. Now, as to 101, if we get to that, hopefully we don't, I'd like to have a minute or two to talk about 101. You're into your remote? You've got it. Well, 101. This is a classic. I don't even think this is close on 101. What we have here is a completely new function of a system. We have the original components of bedside monitoring devices, blood pressure, respiratory rate, heart rate, blood glucose, all those things. You had machines that did not talk to one another. What this invention did, it changed the entire functionality of the system. It changed everything. Could everything there be done by a human being? Absolutely not, and that's why people died. That's why people I know who died, who later on they go and they gather all the records and they sit down and they figure out two weeks later in a big review committee about, oh, this is where it started. That's where the respiratory rate and the blood oxygen rate started to dovetail away from each other. Neither machine will alarm because both of them are within their normal limits. And then you add that fluid retention where diuretics could have been given. We didn't see that because that machine also didn't alarm. But when you have the ability to make all these machines talk to one another through specific means, drivers, segmented look-up tables, specific methods, not broad-ranging statements but specific methods, and now you have the ability for them to know what the other machines are doing, you can make combination alarms, you can save people's lives. This was an entirely newly functional system, never seen before. Millions of dollars were invested in it. Billions of dollars have been sold of systems that do this. This is a completely new paradigm in treatment. It's also a new paradigm in clinical research. It will allow artificial intelligence diagnoses because unless you have all of the inputs and all of the inputs talk to one another in real time, synchronized, you cannot have AI diagnosis. This is not something that this court should say is not patentable because not only is it new functionality, it's a new means, it's a new method, it's never been done before. This is not close. To me, this is far, far beyond anything that would be patent-eligible as an abstract idea. Okay. You've exceeded your time limit. Thank you. James Martin, Your Honors, for GE. First off, on the immunity question, from our perspective, does the briefing reflect sovereign immunity is irrelevant to this case? Let me ask you a couple of housekeeping questions. GE doesn't contest the university's assertion that sovereign immunity can be raised for the first time on appeal. No, we don't. Okay. And you agree that the foundation is an arm of the state? Yes. Okay. Thank you. So the concept is potentially applicable, but as I said, irrelevant. And that follows from a three-part analysis. The first thing is that certainly sovereign immunity would deal with counterclaims. We don't dispute that, whether it was the Eleventh Amendment or state sovereign immunity writ large. But we don't have a counterclaim. We have an affirmative defense, or we have a defense to litigation. We're not doing anything affirmative where the concept would apply, however it's characterized. The second thing is the waiver is broader. Well, you're affirmatively raising a defense. Of course. Yes. But the point is that it's not, excuse me, it's not a counterclaim, an affirmative claim against. Okay. I understand your point that affirmative defenses are permissible if the state has itself waived sovereign immunity by bringing suit. And I don't really think he even disputed that. He then went to, but this isn't a proper defense under 282. Can you deal with that? Well, can I start with the waiver point first? Because I think it's broader. Under Vascaf and under Lapides, the waiver comes from the filing of suit. Then we're entitled to defend it any way we want to without implicating sovereign immunity. I mean, this hasn't been discussed at all, but it occurred to me that if you couldn't defend, that there would be an unlawful taking. Well, at the end of the day, it would be. It would be a due process violation directed at us. So the waiver is broader. Now, as to the 101-282 issue, that is settled by dealer track. It is settled specifically by Versada, where the same argument was advanced and made and rejected over hundreds of years of precedent that suggests that 101 is a patent validity defense, and that's the way the statutory scheme works. What is the 100 years of precedent? What are you talking about? Well, I'm talking about the quote from, I'm sorry, over 50 years. My apologies on the 100. But in Versada, this court said, section 101 is a validity challenge, as K. Fester case in our court and the Supreme Court shows. For over 50 years, the Supreme Court has stated that section 101 is a condition of patentability along with 102, 103. Also, it's viewed ineligibility as a claim of invalidity. On equal footing with 102 and 103, that comes from the Graham case. As I said, it's in Versada. It's in Bascom. It's in dealer track. So your view is that even if we were to disagree with that language, that's not relevant because we're a panel and we can't overrule a prior panel, and a prior panel decision in this case controls. It says, so even, I understand your point is this doesn't even have to be pigeonholed into 282 in order for you to prevail. I understand your bigger point, but on the smaller point, your argument is, but it is covered by 282 because at least two prior cases have expressly said so, and the in-bank court would have to act to say otherwise. I agree with that. Okay. Is there anything else on that you wanted to cover? Because I actually wanted to move you to the merits of that. Yes. Only that the SCA hygiene case does not change this analysis in any respect. It does not give the court license to go back and re-examine. Well, isn't that just because latches, unlike eligibility, is not listed in the Patent Act? Well, the problem with the SCA hygiene case is that latches not only wasn't listed, but it was in conflict with what the statute provided. There's no inconsistency or conflict with the statute here. And number two, in SCA hygiene, when the court looked at the defense of estoppel, which also was not in the statute, but not in conflict with the statute, it recognized that estoppel could still survive. So in SCA hygiene, we don't have a discussion of 101 versus 282, and we have a defense here that's consistent with the statute, not in conflict with it. On the merits, what was described here as a patentable invention, indisputably, was a description of something that potentially could be patentable, but it was described as a novel breakthrough. That is not enough. We know from this Court's decisions that to get to patent eligibility, you have to go to the claim elements, construe it in light of the specifications, and look specifically at that language to see if there's an inventive concept. Well, one of the things that confused me when opposing counsel was standing up is he was claiming this has never been done before, it's never been done. But on column two of the patent, really line one, it talks about how this could all be done with paper and manually, with people integrating this psychological or physiological data. It just says that would consume substantial human resources and increase the likelihood of errors into the process, because it would be done manually. But it could, I mean, the patent expressly says on its face the very process that they're by paper and pen manually by people prior to this, right? By health care workers, yes. That's correct. So it's not the case that no one ever had before this patent the concept of integrating the data, the patent expressly on its face says it was being done manually by health care providers prior to this. Yes. So isn't this quintessentially the use of computer case? Yes. The patent itself says this was being done by humans before, but we figured out you can use a computer to integrate all the data and it will have fewer errors. And do it faster. And do it faster. Or do it better. Right. And if you go to the claim or the specification. Are all of the components of the system basic components that are, is there an argument that any of the individual components are new, novel components? Like I think that they've made some arguments about the drivers, for example. Because sometimes, you know, you can create a system and a component of that system is truly, you know, inventive such that even though it's something that could have been done by pen and paper, it's not just take a generic computer. It is we have created a special system that's capable of doing this that never existed before. Yes. Is there anything along those lines that you would like to address? Well, what I'll throw at you is I agree conceptually that a component of this system, if properly claimed, could give rise to something that's patent eligible. But when you go to the claims that relate to the driver or the tables, which are the two features that are specifically mentioned, you are not going to find what this court has insisted on, which is the technological hook, the improvement, the extra language that specifically claims a change in technology, functionality, computers, or software. Which claims are the driver? So the driver, if you go to Appendix 83. I'm on the patent. Just tell me what claim. Okay. The driver is Claim 10, I believe. And let me double check that. No, that's not the driver. I'm sorry. Yes, Claim 10. Claim 10? Yes. At least one bedside computing device having at least one. Oh, there it is. I'm sorry. Bedside driver. So with respect to either the specification or the language, what you get at when you look at the driver is you get convert, you get interrupt, you get facilitate, you get interpret in the columns. But nowhere after that do we learn how that's accomplished and how is the key to eligibility. It just happens. And this brings us back to the series of patents that this Court has looked at in numerous cases where we are back to collection, analysis, display. And that is not the inventive concept that gets beyond the eligibility inquiry. And there's no step two stuff. No. There, the inventive concept we know has to still reflect the same kind of improvement. That's the difference. It's not just that the solution is the same. You're saying there might be. Yes. There could if it was claimed. But it's not. And the fact that it's a novel solution and that's what's described, what we're left with then is patenting the abstract concepts, which this Court has said we don't allow. So I'll be honest. I have the word how written next to three paragraphs with a question mark. I can direct you to them, but I don't think it's probably necessary. On column seven, when it talks about the driver, this is one of my, I guess this would be my fourth how written next to it. The bedside device can also contain a driver for each different bedside machine connected to. This driver can be used to translate the data. Each driver can have knowledge of this. Additional drivers can interpret the data. What? I mean, how? Right. How is it done? It just happens. That's the hole in the analysis. And as we know from cases that have been decided, as our 20HA letters unfortunately reflect, right up to the present, BSG technology is a perfect illustration of the tension that's going on here or the dispute. And in BSG technology, what was in the claims was the solution. It never got to the how. And the court pointed out that under ALICE, it's how those specific elements are claimed that matters, and that's where this patent falters. That's what the district court concluded walking through it. That analysis is consistent with this court's case law, and it should be affirmed. Thank you. Thank you. Your Honor, it tells how. It talks about segmenting the data. It talks about drivers absolutely done for each individual device. This is not a situation, I mean, using the logic that we've heard here. Show me where in the patent. Yeah. As usual, Judge Moore took the words right out of my mouth. I've got to get my highlighted copy. Okay. We talked about device drivers in column three. The bedside computing devices can include device drivers. What line are you on, please? Oh, I'm sorry. Eight. Various bedside devices with the bedside device can communicate. So these drivers have... How? I'm sorry? How? Well, then we talked about synchronization, segmentation, column three, lines 27 to 35. Machine-independent format dynamically matched with discrete workflow data elements. For example, a data stream can be received from each of the bedside machines, and a transport protocol particular to one of the bedside machines can be determined for each data stream. That's how. And yet another embodiment at line 44. No, no, no, no, no, no. That's like telling my children, you know, you can each go and set the table. My children can each go set the table. My children can each translate all of this. My children are superstars. They can do all this. How are they going to do it? I've given them no direction whatsoever on how they're going to do it. You just said there's a device that's going to do this. Either it's already well known to the art, or you didn't enable it. That's your two choices. And neither one of those help you with 101. I disagree, Your Honor. I think that the drivers are also in paragraph in column seven at line 48 through 56. It talks about the transforming of data at column five, lines 33 through 37. I mean, we can abstract anything. Column five, 33 to 37, that's a giant howl next to it on my thing. The integration system can receive information, including physiological information from multiple sources, transform the information into data elements formatted according to a data scheme. We have no idea what data scheme. And we have absolutely no idea how this transformation is to take place because there's nothing in this patent that tells us. Well, a person of ordinary skill in the art would understand that. I mean, this— Then it's already well known, isn't it? Well, that's a 102-103 argument. No, actually, it's unfortunately part of 101. But what we get down to is, you know, your example, this was all done by human hands. Yeah, people died. It was not done by human hands. So what was said—I asked you that question. I didn't get to it's in the spec. Yes. So what's in the spec wasn't true? No, what was in the spec was the prior art, was describing what the problems were. That is, people can always go and take data after someone is dead and reconstruct what happened. Wait, the spec says nothing about dead people. The spec says this manual data entry process consumes substantial human resources and increases the likelihood of errors. It doesn't say everybody died. No, no, no. That's not talking—you're talking about a different error. You're talking about transcription errors. You're talking about human error in transcribing information. Did you say that? Well, that's what is meant. It talks about human error in transcribing data. If you were to write to her, was she to write to him, you know, the telephone tag thing. But what we have here is a situation where you have bedside machines that don't talk to one another. They all are independent. They alarm independently. They read out independently. And to figure out what happened to a particular patient at a particular time, you have to go back and you have to figure it out. And we had expert declarations that talked about this in great detail, none of which were refuted. They offered zero evidence. There was no claims construction on what a driver means. There was no claims construction on what segmented data means. You can take—yes, you can take those terms out of the claims and you can construe them consistently with the specification and you can get a much narrower result. But there's no preemption here. There's zero preemption risk. They don't even argue there's a preemption risk. But we had expert declarations unrefuted. We never got a claims construction. We ought to have at least the opportunity under Atrix Software and other cases to go in and make them put on a case that this is conventional use of these components. In fact, it's not conventional use because the only evidence of conventional use is that they were each used individually. They were never used together. Okay. We've far exceeded our time. Thank you, Your Honor. Thank you. Thank you.